Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/04/2025 09:10 AM CDT

Amorak, Inc., and Edwin Brown, appellants, and cross-appellees, v. Cherry County Board of Commissioners, appellee and cross-appellant, and Danielski Harvesting & Farming, LLC, intervenor-appellee.

___ N.W.3d ___

Filed April 4, 2025.    No. S-23-1040.

1. **Jurisdiction: Appeal and Error.** A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.

2. **Political Subdivisions: Judgments: Appeal and Error.** When a decision regarding a conditional use or special exception permit is appealed under Neb. Rev. Stat. § 23-114.01(5) (Reissue 2022) and a trial is held de novo under Neb. Rev. Stat. § 25-1937 (Reissue 2016), the findings of the district court shall have the effect of a jury verdict and the court's judgment will not be set aside by an appellate court unless the court's factual findings are clearly erroneous or the court erred in its application of the law.

3. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.

4. **Zoning: Appeal and Error.** The interpretation of a zoning regulation is a question of law that an appellate court reviews independently of the lower court.

5. **Jurisdiction: Appeal and Error.** Where a lower court lacks subject matter jurisdiction to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court.

6. **Statutes: Appeal and Error.** The right of appeal in this state is purely statutory; unless a statute provides for an appeal from the decision of a quasi-judicial tribunal, such right does not exist.

7. **Statutes.** Statutory interpretation begins with the text.

8. **Statutes: Legislature: Intent.** In order for a court to inquire into a statute's legislative history, that statute in question must be open to construction, and a statute is open to construction when its terms require interpretation or may reasonably be considered ambiguous.

9. **Political Subdivisions: Judgments: Appeal and Error.** The plain and unambiguous language of Neb Rev. Stat. § 23-114.01(5) (Reissue 2022) authorizes appeals of decisions regarding conditional use permits; it does not cabin such appeals to a particular type of decision or litigant.

10. **Zoning: Words and Phrases.** Zoning is the process that a community employs to legally control the use which may be made of property and the physical configuration of development upon tracts of land located within its jurisdiction.

11. **Judgments: Appeal and Error.** In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.

Appeal from the District Court for Cherry County, KARIN L. NOAKES, Judge. Affirmed.

Brian T. McKernan and Alexander K. Shaner, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellants.

Eric A. Scott, Cherry County Attorney, and David S. Houghton and Justin D. Eichmann, of Houghton Bradford Whitted, P.C., L.L.O., for appellee Cherry County Board of Commissioners.

Stephen D. Mossman and Andrew R. Spader, of Mattson Ricketts Law Firm, L.L.P., for intervenor-appellee Danielski Harvesting & Farming, LLC.

FUNKE, C.J., MILLER-LERMAN, CASSEL, STACY, PAPIK, and FREUDENBERG, JJ.

PAPIK, J.

The Cherry County Board of Commissioners (Board) issued Danielski Harvesting & Farming, LLC (Danielski), a

conditional use permit to build a commercial hog facility on its property. Neighboring landowners, Amorak, Inc., and Edwin Brown (collectively Amorak), appealed to the district court pursuant to Neb. Rev. Stat. §§ 23-114.01(5) (Reissue 2022) and 25-1937 (Reissue 2016) and *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008). After a trial de novo, the district court determined that Danielski's application for the conditional use permit complied with the pertinent zoning statute and regulations, and it therefore affirmed the issuance of the permit.

Amorak appeals, claiming that because Danielski was the owner of the property and not the facility's operator, it alone could not establish a right to a conditional use permit under zoning regulations regarding odor mitigation and water contamination, and that, even if it could, it had not done so. The Board cross-appeals, raising a jurisdictional argument. The Board asserts that Amorak, as a nonapplicant, was not entitled to a trial de novo before the district court. We find no merit to the parties' arguments and affirm.

## I. BACKGROUND

### 1. Board Issues Conditional Use Permit to Danielski

Danielski applied for a conditional use permit to build a commercial hog facility on property it owned in rural Cherry County, Nebraska. The facility was partly intended to provide manure to fertilize Danielski's crops. After an initial review by the Cherry County Planning and Zoning Commission, the Board held a public hearing on the application. Neighboring landowners, including Amorak, appeared at the hearing to object to the issuance of the permit. After the hearing, the Board issued the conditional use permit to Danielski.

### 2. Amorak Pursues Appeal in District Court

Amorak appealed the Board's decision to the district court, seeking a trial de novo. Its notice of appeal stated that Amorak was appealing the Board's order "pursuant to . . .

§§ 23-114.01 and 25-1937 and *In re* [*Application of*] *Olmer*." Amorak subsequently filed a complaint and petition on appeal with the district court. Relevant here, Amorak claimed that the conditional use permit did not comply with applicable zoning regulations that, according to Amorak, required the *operator* of the facility to show compliance regarding odor mitigation and water contamination.

In its answer, the Board generally denied Amorak's claims. It also asserted affirmative defenses, including failure to state a claim and lack of jurisdiction.

Danielski filed a petition in intervention, which was later granted by the district court.

### 3. District Court Rejects Board's Jurisdictional Challenge

The Board sought to have the proceeding dismissed for lack of jurisdiction. The Board argued that §§ 23-114.01 and 25-1937 and *In re Application of Olmer, supra*, did not allow a trial de novo for anyone other than an applicant for a conditional use permit who was aggrieved by a rejected application. According to the Board, anyone other than the applicant was entitled to review only by a petition in error.

The district court rejected the Board's jurisdictional argument.

### 4. District Court Conducts Trial de Novo

The matter proceeded to a trial de novo on Amorak's appeal of the issuance of the conditional use permit. The district court received the Cherry County zoning regulations as an exhibit. Amorak, the Board, and Danielski presented testimony and other exhibits to support their respective positions.

In support of its argument that the applicable regulations required a plan for compliance from the operator of the proposed facility and not merely from the owner of the land, Amorak presented evidence that although Danielski owned the land upon which the proposed hog confinement facility would be located, it did not plan to operate the facility itself,

and that, instead, an entity called Sandy Pine would operate the hog confinement facility on land leased from Danielski. There was testimony that both Danielski and Sandy Pine financed the construction of the facility. Danielski presented evidence that it owned the land and would own the buildings in which the hog confinement facility would operate, although the equipment within the buildings would be owned by Sandy Pine and the hog confinement operations would be conducted by Sandy Pine. Danielski would then apply to its fields the manure produced by the operation.

The parties also presented testimony and exhibits regarding plans related to odor and dust elimination and water contamination. We summarize relevant portions of that evidence below in our analysis.

### 5. DISTRICT COURT AFFIRMS
### CONDITIONAL USE PERMIT

Following a trial de novo, the district court entered its judgment, which we discuss in more detail in our analysis. The district court determined that the relevant statute and zoning regulations did not support Amorak's argument that the regulations required the operator of the facility to provide certain required assurances for odor mitigation. The district court then explained how the assurances provided by Danielski satisfied the applicable zoning regulations. The district court also found that Danielski's application for the conditional use permit was consistent with the zoning regulations addressing water contamination. Having determined that Danielski's application complied with the relevant zoning regulations, the district court affirmed the Board's issuance of the conditional use permit.

Amorak now appeals, and the Board cross-appeals.

## II. ASSIGNMENTS OF ERROR

On appeal, Amorak assigns, consolidated, that the district court erred in (1) finding that the owner and operator of the confined animal feeding use were "irrelevant" for purposes of demonstrating compliance with the zoning regulations and (2)

determining the applicable zoning regulations concerning odor and water contamination had been satisfied.

On cross-appeal, the Board assigns, consolidated, that the district court erred in determining that Amorak, as a mere neighboring landowner, was entitled to a trial de novo pursuant to § 23-114.01(5) and *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008).

### III. STANDARD OF REVIEW

[1] A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *State ex rel. Rhiley v. Nebraska State Patrol*, 301 Neb. 241, 917 N.W.2d 903 (2018).

[2] When a decision regarding a conditional use or special exception permit is appealed under § 23-114.01(5) and a trial is held de novo under § 25-1937, the findings of the district court shall have the effect of a jury verdict and the court's judgment will not be set aside by an appellate court unless the court's factual findings are clearly erroneous or the court erred in its application of the law. *Egan v. County of Lancaster*, 308 Neb. 48, 952 N.W.2d 664 (2020).

[3] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court. *Mullins v. Box Butte County*, 317 Neb. 937, 13 N.W.3d 67 (2024).

[4] The interpretation of a zoning regulation is a question of law that an appellate court reviews independently of the lower court. *Dirt Road Development v. Hirschman*, 316 Neb. 757, 7 N.W.3d 438 (2024).

### IV. ANALYSIS

#### 1. JURISDICTIONAL ISSUE ON CROSS-APPEAL

[5] Before reaching the merits, it is our duty to determine whether we have jurisdiction over an appeal. See *Main St Properties v. City of Bellevue, ante* p. 116, 13 N.W.3d 911

(2024). Where a lower court lacks subject matter jurisdiction to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court. *Lancaster County v. Slezak*, 317 Neb. 157, 9 N.W.3d 414 (2024). Because the Board's cross-appeal challenges the district court's subject matter jurisdiction over Amorak's direct appeal, we begin there.

On cross-appeal, as it did before the district court, the Board contends that the district court lacked subject matter jurisdiction because Amorak selected an avenue of review that was not available to it. As we will now explain, we disagree.

[6] The right of appeal in this state is purely statutory; unless a statute provides for an appeal from the decision of a quasi-judicial tribunal, such right does not exist. *Preserve the Sandhills v. Cherry County*, 313 Neb. 668, 986 N.W.2d 265 (2023). We have held that one who seeks review of a decision granting or denying a conditional use permit has two statutory options: (1) filing a petition in error under Neb. Rev. Stat. § 25-1901 (Reissue 2016) or (2) filing an appeal under § 23-114.01(5) and the procedure discussed in *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008). See *Preserve the Sandhills v. Cherry County, supra*. The nature and scope of the district court's review depends on which of these options a litigant selects; and courts will respect such litigant's chosen method of challenging a conditional use permit decision, regardless of the consequences for the litigant. See *id.* Here, Amorak, a neighboring landowner of the applicant, Danielski, opted to appeal the issuance of the conditional use permit under § 23-114.01(5), rather than pursue a petition in error. The Board's core premise is that the district court lacked jurisdiction over Amorak's appeal because only an *applicant* who has been *denied* a conditional use permit can pursue an appeal to the district court for de novo review. But such a limitation on appellate jurisdiction has no support in our statutes.

Two statutes are relevant here, §§ 23-114.01 and 25-1937. The current version of § 23-114.01(5) states that, subject to one exception not applicable here, "an appeal of a decision by the county board of commissioners or supervisors regarding a conditional use . . . shall be made to the district court." In *In re Application of Olmer*, we observed, "§ 23-114.01(5) clearly provides for a right of appeal to the district court from [a decision of the county board of commissioners], without setting forth any procedure for prosecuting the appeal." 275 Neb. at 859, 752 N.W.2d at 130. In the absence of such procedure, we held that the appeal procedure in § 25-1937 was implicated. See *In re Application of Olmer, supra.* Section 25-1937 provides in part:

> When the Legislature enacts a law providing for an appeal without providing the procedure therefor, the procedure for appeal to the district court shall be the same as for appeals from the county court to the district court in civil actions. Trial in the district court shall be de novo upon the issues made up by the pleadings in the district court.

Giving the language of § 23-114.01(5) its plain and ordinary meaning, we see nothing that limits the district court's jurisdiction as to the type of decision to be reviewed or the litigant who seeks that review. See *Precision Castparts Corp. v. Nebraska Dept. of Rev.*, 317 Neb. 481, 10 N.W.3d 707 (2024) (statutory language is to be given its plain and ordinary meaning). Looking first at the type of decision, § 23-114.01(5) authorizes the filing in the district court of an appeal of "a decision . . . regarding a conditional use." We have specifically held that "[t]he plain meaning of the term 'decision' in § 23-114.01(5), in the context of the entire statute, is a decision to grant, deny, or partially grant and partially deny a [conditional use permit]." *Preserve the Sandhills v. Cherry County*, 310 Neb. 184, 191, 964 N.W.2d 721, 726-27 (2021). As to the type of litigant, § 23-114.01(5) similarly includes no provision limiting who may appeal. Contrary to the Board's position

that only an applicant can appeal the denial of a conditional use permit, § 23-114.01(5) does not restrict such an appeal to a particular type of decision or litigant. We have held that a party objecting to the issuance of a conditional use permit must establish that they have standing, see *Egan v. County of Lancaster*, 308 Neb. 48, 952 N.W.2d 664 (2020), but that is not a barrier to Amorak's challenge in this case.

To oppose this reading of the relevant statutes, the Board formulates an argument using case law and § 23-114.01(5)'s legislative history. The Board first calls our attention to *Mogensen v. Board of Supervisors*, 268 Neb. 26, 679 N.W.2d 413 (2004) (superseded by statute on other grounds as stated in *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008)), and *Niewohner v. Antelope Cty. Bd. of Adjustment*, 12 Neb. App. 132, 668 N.W.2d 258 (2003) (superseded by statute on other grounds as stated in *In re Application of Olmer, supra*). Those cases, which predate the current version of § 23-114.01(5), held that appeals from a planning commission, county board, or board of supervisors must only be made to the board of adjustment. In 2004, in response to *Mogensen* and *Niewohner*, the Legislature amended § 23-114.01(5) to add the following language: "An appeal of a decision by the county planning commission or county board of commissioners or supervisors regarding a conditional use . . . shall be made to the district court." See 2004 Neb. Laws, L.B. 973, § 3. See, also, *Preserve the Sandhills v. Cherry County*, 310 Neb. 184, 964 N.W.2d 721 (2021); *In re Application of Olmer, supra*. The Board proffers that this language must pertain only to an applicant appealing the denial of a conditional use permit because *Mogensen* and *Niewohner* involved such appeals. The Board goes on to claim that *In re Application of Olmer* confirmed this interpretation when it applied the amended statutory language to an applicant's appeal from the denial of a conditional use permit and did not expressly expand review to any other litigant or decision of the Board. Therefore, the

Board submits, review pursuant to § 23-114.01(5) can only be initiated by disappointed applicants.

[7-9] We find no merit to this attempt by the Board to circumvent the plain meaning of § 23-114.01(5). We see no reason to resort to legislative history. Statutory interpretation begins with the text. *In re Estate of McCormick*, 317 Neb. 960, 12 N.W.3d 802 (2024). In order for a court to inquire into a statute's legislative history, the statute in question must be open to construction, and a statute is open to construction when its terms require interpretation or may reasonably be considered ambiguous. *Nebraska Journalism Trust v. Dept. of Envt. & Energy*, 316 Neb. 174, 3 N.W.3d 361 (2024). As we have explained, however, the plain and unambiguous language of § 23-114.01(5) authorizes appeals of decisions regarding conditional use permits; it does not cabin such appeals to a particular type of decision or litigant. Thus, we need not refer to the statute's legislative history to ascertain its meaning. Moreover, even if *Mogensen* and *Niewohner* involved frustrated applicants and prompted the amendment to § 23-114.01(5), the Legislature did not choose language to limit review to applicants. And while *In re Application of Olmer* involved an applicant seeking review of a denial of a conditional use permit, we did not pronounce that the procedure recognized there was available only to frustrated applicants. The Board's reliance on these cases cannot prevail over plain and unambiguous statutory language.

The Board also claims that under the procedure put forth in *In re Application of Olmer*, Amorak could not appeal the issuance of the conditional use permit because, as a nonapplicant, it was not a "party." Brief for cross-appellant at 38. The Board notes that because § 23-114.01(5) provides a right to appeal but does not specify a corresponding procedure, the procedure in § 25-1937 is implicated. See *In re Application of Olmer, supra*. Section 25-1937 provides that "the procedure for [an] appeal to the district court shall be the same as for appeals from the county court to the district court in civil

actions." The Board asserts that the procedure for appeals from a county court to a district court in a civil action is outlined in Neb. Rev. Stat. § 25-2728(1) (Cum. Supp. 2024), which allows "[a]ny *party* in a civil case [to] appeal from the final judgment or final order of the county court to the district court of the county where the county court is located." (Emphasis supplied.) According to the Board, Amorak cannot appeal under this procedure because it was not a party before the Board. The Board likens an appeal by Amorak, which provided testimony at a public hearing opposing the conditional use permit, to an appeal by a mere witness in a civil case. We are not convinced.

As we have explained, the text of § 23-114.01(5) grants a right of appeal from a conditional use permit decision and does not limit that appeal to any particular litigant. The Legislature has given nonapplicants and applicants the right to appeal through the same statutory provisions. The Legislature could have limited such appeals to applicants explicitly and directly, rather than through the series of inferences the Board suggests, but it did not. See, e.g., *State v. A.D.*, 305 Neb. 154, 162, 939 N.W.2d 484, 489 (2020) ("[o]ne would expect such significant expansions of county court authority [suggested by appellant] to be stated [by the Legislature] in much clearer terms"). And, in any event, the Board's argument on this point proves too much: Under the Board's logic, even an applicant could not appeal a decision regarding a conditional use permit because an applicant before a county board is not a party in a civil case. Proceedings before a county board to obtain a conditional use permit are not a civil case, something we recognized in *In re Application of Olmer*, when we imported appellate procedure for civil cases by analogy. Again, the Board's argument cannot overcome the plain and unambiguous language of § 23-114.01(5).

Having resolved the jurisdictional issue raised in the Board's cross-appeal, we now proceed to the merits of Amorak's direct appeal.

### 2. Who Must Demonstrate Compliance With Zoning Regulations?

The district court found that Danielski, as the owner of the property, was the only entity allowed to apply for a conditional use permit and was required to show compliance with the zoning regulations; the district court found that the operator of the facility was not required to do so. On appeal, Amorak assigns that the district court erred in finding that the owner and operator of the confined animal feeding use were "irrelevant" for purposes of demonstrating compliance with the zoning regulations. Amorak broadly argues that the applicable zoning regulations required assurances or other evidence from Sandy Pine and that the district court erroneously found that evidence provided solely by Danielski satisfied those requirements. Based on our analysis of the relevant statutory provisions and zoning regulations, we conclude that the district court did not err in applying the law in this manner. See *Egan v. County of Lancaster*, 308 Neb. 48, 952 N.W.2d 664 (2020) (appellate court will not set aside findings of district court unless district court erred in application of law). See, also, *Mullins v. Box Butte County*, 317 Neb. 937, 13 N.W.3d 67 (2024) (statutory interpretation is question of law); *Dirt Road Development v. Hirschman*, 316 Neb. 757, 7 N.W.3d 438 (2024) (interpretation of zoning regulation is question of law).

For starters, we do not believe it is accurate to say that the district court found that "the owner and operator . . . were irrelevant," as Amorak assigns. In affirming the issuance of the conditional use permit, the district court observed that under the pertinent statutory provisions and zoning regulations, conditional uses are granted to property owners for the specified property. Therefore, the district court found that it was the owner, Danielski, not the operator, Sandy Pine, that was obligated to meet all requirements outlined in the regulations, including the requirement to provide assurances. We do not read the district court's order to find that the owner and

operator were irrelevant; we read it as focusing on the use of the property by the property owner. We conclude that this was a correct application of the relevant statute and regulations.

We begin with the relevant statute. Section 23-114.01(4) allows the Board to "grant conditional uses . . . to property owners for the use of their property." See, also, § 23-114.01(5) (giving Board, rather than planning commission, authority to grant conditional uses under certain circumstances). Section 23-114.01(4) continues:

> The granting of a conditional use permit . . . shall only allow *property owners* to put their property *to a special use* if it is among those uses specifically identified in the county zoning regulations as classifications of uses which may require special conditions or requirements to be met *by the owners* before a use permit . . . is authorized.

(Emphasis supplied.)

In this case, the operative zoning regulations are the Cherry County zoning regulations. See Cherry County, Nebraska, Zoning Regulations, art. 1 to art. 14, §§ 101 to 1404 (2008 & rev. 2016). Those regulations define a "use" as "[t]he purpose or activity for which land and buildings thereon is designed, arranged, intended, or for which it is occupied or maintained." See § 303.86. According to § 303.22 of the zoning regulations, a conditional use permit gives permission to the applicant "to develop the specified conditional use" and "shall specify the conditions of approval." Under § 1001 of the zoning regulations, the Board "may grant conditional uses to property owners for the use of their property in conformance and compliance with the limitations . . . set forth [in the zoning regulations]." Accordingly, it is the "property owner or authorized agent of such owner(s)" who initiates and submits the application for a conditional use, which shall include a detailed description of the proposed use and the activities involved in it and, for confined animal feeding uses, a description of how the use will address odor, dust, and potential air,

water, and soil pollution, among other things. See §§ 1002, 1002.03, and 1002.10. See, also, § 303.23 (defining confined animal feeding use). The zoning regulations go on to provide that confined animal feeding uses must comply with certain requirements. See § 501.05(15).

[10] Both § 23-114.01 and the zoning regulations above illustrate that the zoning regulations govern land use. As we have said, "[z]oning is the process that a community employs to legally control the *use* which may be made of property and the physical configuration of development upon the tracts of land located within its jurisdiction." *Enterprise Partners v. County of Perkins*, 260 Neb. 650, 656, 619 N.W.2d 464, 468 (2000) (internal quotation marks omitted) (emphasis supplied). The onus is on the property owner or its authorized agent to apply for the conditional use permit and to show that the proposed use complies with pertinent zoning regulations. The fact some other party may do certain things on the property may matter insofar as its activities are relevant to what the property owner is required to show to obtain the conditional use permit, but the property owner carries the burden of making that showing. Here, Danielski owns the property for which it sought a conditional use permit; Danielski is the entity charged with supporting that application for the proposed land use.

We are not persuaded by Amorak's suggestions that the regulations required some showing by Sandy Pine, as operator. Take, for example, Amorak's assertion that Sandy Pine should have provided assurances or evidence as to its role because in two instances the zoning regulations mention the "owner/operator." See § 501.05(15)(F) and (I). Each of those instances refers to demonstrations of compliance after the conditional use permit is granted—soil testing, consent to unannounced inspections, notification of noncompliance, and agreement to comply with the Board's postconditional use permit orders. *Id.* These references to "owner/operator" do nothing to change the property owner's initial obligation to show compliance with the regulations to obtain a conditional use permit, nor

do the references require separate showings by Sandy Pine at this stage.

And to the extent Amorak asserts that Sandy Pine, because it will operate the hog facility, is the "owner of the proposed confined feeding use" for purposes of § 501.05(15)(D), a regulation that requires such person or entity to provide assurances regarding the odor the facility will produce, we also are unswayed. As we have just noted, the zoning regulations make separate references to the "owner/operator." These references, in our view, demonstrate that the zoning regulations contemplate that someone other than the owner may conduct operations on the real estate at issue but do not recognize such persons as the "owner of the proposed confined feeding use." We do not understand the "owner of the proposed confined feeding use" to refer to an entity that will merely conduct activities on the real estate at issue.

Finally, Amorak suggests that to secure a conditional use permit, Danielski was required to show that it had a legal right to control the operations of the confined animal feeding use. We see no basis in the zoning regulations for this argument. Once a property owner has obtained a conditional use permit, other provisions incentivize both owners and operators to comply with zoning regulations: It is a misdemeanor for owners and operators to violate zoning regulations or conditional use permits, and they are also subject to other remedies, such as injunctions. See Neb. Rev. Stat. § 23-114.05 (Reissue 2022). See, also, §§ 1202 and 1203. See, also, *Egan v. County of Lancaster*, 308 Neb. 48, 952 N.W.2d 664 (2020) (noting distinction between obtaining special use permit pursuant to zoning regulations and suit alleging violation of special use permit or zoning regulations pursuant to § 23-114.05); *Johnson v. Knox Cty. Partnership*, 273 Neb. 123, 728 N.W.2d 101 (2007) (involving suit against owner and operator seeking remedies for violation of zoning regulations pursuant to § 23-114.05); *Thieman v. Cedar Valley Feeding Co.*, 18 Neb. App. 302, 789 N.W.2d 714 (2010) (same).

Perhaps most notably, Amorak does not specify what assurances or other information Sandy Pine, as the operator of the confined animal feeding use, ought to have provided. And as we are about to explain, we are unpersuaded by Amorak's contentions that the district court erred in finding the evidence provided by Danielski to be sufficient to satisfy the zoning regulations' requirements.

### 3. SUFFICIENCY OF DANIELSKI'S SHOWING

Amorak challenges the district court's determination that Danielski satisfied zoning regulations concerning odor and water contamination and was entitled to a conditional use permit. Upon a trial de novo, the district court found that Danielski had made the required showing. Amorak now challenges that finding.

[11] In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. See *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 959 N.W.2d 251 (2021). Viewing the disputed factual findings through this lens, we discern no error, nor do we find that the district court erred in its application of the law. See *Egan, supra*.

### (a) Owner, Not Operator

Before addressing Amorak's specific arguments regarding odor and water contamination, we dispose of one claim common to both: Again, Amorak asserts that the showing supplied by Danielski was insufficient because Danielski is not the operator of the confined animal feeding use. As we have already explained, this position lacks merit, and we will not discuss it further.

(b) Odor Assurances

Regarding odor mitigation, there are two relevant zoning regulations: §§ 501.05(15)(D) and 1008.08. Section 501.05(15)(D) allows the Board to authorize a hog operation to exceed 2,000 feeding units per section of land if there are assurances, "acceptable to the . . . Board," that more properties will not be subjected to "unreasonable levels of odor for unreasonable duration periods." Section 1008 provides that in reviewing "any conditional use application," the Board shall consider certain aspects of the proposed use and, in authorizing "any conditional use," shall attach specific requirements to assure continued acceptability. Section 1008 goes on to list the specific aspects required at a minimum and the required assurances of continued acceptability. Among them, § 1008.08 requires that the hog operation will not result in "inappropriate levels of . . . dust, odor, or undue potentials for air . . . hazards."

Following the trial de novo, the district court found Danielski's conditional use permit application sufficient under these regulations. The district court observed that Danielski's application contained a plan that detailed several ways odor would be managed. The district court recounted:

> The assurances include keeping the floors clean and dry, avoiding manure buildup, ensuring adequate ventilation, weekly power washing of interior building surfaces, utilizing a feed delivery system that minimizes dust, utilizing a large manure storage pit, and regular maintenance and inspection of the storage pit. All facilities will be power-ventilated, greatly reducing gas and moisture buildup which will reduce the intensity of the odor.
>
> In addition, the manure pit is designed to accommodate 180 days of underground manure storage and to hold twice as much as needed. The Operations and Maintenance Plan requires routine maintenance and inspections to avoid excess sludge build-up.

Other assurances include the actual distance between the facility and residences, schools, churches, or public use areas, the vast number of acres available to spread the manure, injecting instead of spreading the manure topically, and applying the manure during times when air is rising and not on hot, humid days.

Now on appeal, Amorak posits that the district court committed legal and factual errors in finding the assurances Danielski provided were sufficient for purposes of both §§ 501.05(15)(D) and 1008.08. As we will explain, however, Amorak misconstrues the zoning regulations and relies on a one-sided view of the evidence. Upon our review, we determine that Amorak has identified no legal errors related to odor assurances. And considering the judgment in the light most favorable to Danielski, and giving it the benefit of every reasonable inference deducible from the evidence, we are not convinced by Amorak's arguments that the district court's factual findings regarding odor assurances were clearly erroneous.

We first dispose of the legal error Amorak alleges. Amorak asserts that if an applicant seeks the class of permit Danielski sought, that applicant, by definition, cannot have effective provisions to collect or eliminate odors.

Some background is necessary to understand Amorak's contention. The zoning regulations allow the Board to issue three different classes of conditional use permits for confined animal feeding operations. The classes of permits differ as to the ways manure is "collected and digested." See § 303.23. The distinctions between classes of permits are significant primarily in terms of how close the regulations permit the different classes of confined animal feeding operations to be located to churches, schools, and other identified public facilities.

Danielski sought a conditional use permit for a "Class AN" confined animal feeding use. See § 501.05(15)(C). The zoning regulations define a Class AN confined animal feeding use as one that uses anaerobic processes for the "collect[ion] and digest[ion]" of manure. See § 303.23. Under the regulations,

more distance is required between Class AN facilities and churches, schools, and other identified areas than is required for other classes of facilities and such areas. See § 501.05(15). And while the zoning regulations require that other classes of confined animal feeding operations employ certain mechanisms to control dust generated within any buildings to prevent the blowing of dust and odor onto adjoining properties, the regulations state that in a Class AN facility, "there are no effective provisions made for the collection and elimination of dust and odor from any buildings associated with such use." See § 303.23. Amorak suggests that by definition, then, a Class AN confined animal feeding use cannot meet the odor mitigation requirements of §§ 501.05(15)(D) and 1008.08.

The zoning regulations do not support Amorak's position that a Class AN confined animal feeding use cannot satisfy §§ 501.05(15)(D) and 1008.08 as a matter of law. To begin, the section of the regulations that lists the rules governing Class AN facilities itself undermines any notion that in a Class AN facility, steps could never be taken to minimize odor. That section provides that exceptions to the minimum distance requirements governing Class AN facilities can be approved where there are "special provisions for odor and dust control." § 501.05(15)(C).

On top of that, if Amorak's argument were carried to its logical conclusion, no Class AN facility could ever be approved. As we have observed, § 1008 requires the minimization of odor for "any conditional use application." But as Amorak understands Class AN conditional use applications, they can never be accompanied with plans to minimize dust or odor. Reading the regulations to create a class of confined animal feeding operations that could never be granted a conditional use permit would run afoul of rules of interpretation that compel us to strive to avoid rendering any section of the regulations superfluous. See *Dirt Road Development v. Hirschman*, 316 Neb. 757, 7 N.W.3d 438 (2024).

We find that the regulation defining Class AN facilities is more naturally read to provide that a Class AN facility may be approved without the applicant demonstrating the same dust control measures required for the other classes of confined animal feeding operations. We conclude that the district court did not err in rejecting Amorak's argument that a Class AN facility could never satisfy regulations concerning odor.

In numerous ways, Amorak also takes issue with the district court's factual findings concerning odor assurances. Amorak argues that the "Operation and Maintenance Plan" and "Best Management Practices" Danielski submitted with its application fell short of the odor assurances required by §§ 501.05(15)(D) and 1008.08. Applying our standard of review to Amorak's arguments, we perceive no clear error.

In part, Amorak contends that the district court clearly erred in finding that Danielski's odor assurances satisfied the zoning regulations because the assurances offered "no specific details to guide the District Court . . . for how, when, where, and who will be performing [the specific odor mitigation] tasks nor any objective measurement or feedback to ensure such practices are actually identifying, controlling and/or reducing odor." Brief for appellants at 28. We do not believe this alleged deficit amounts to a failure to fulfill the zoning regulations' requirements for odor assurances because §§ 501.05(15)(D) and 1008.08 do not call for the specificity that Amorak envisions. Section 501.05(15)(D) requires that the odor assurances be "acceptable to the . . . Board." Similarly, § 1008.08 requires assurances that the confined animal feeding use "will not result in inappropriate levels of . . . dust, odor, or undue potentials for air . . . hazards." Upon our review for clear error, we conclude that the odor mitigation measures identified by the district court are supported by the record and are sufficient to satisfy the requirements as articulated by the zoning regulations.

Amorak also claims that the district court's factual findings regarding odor assurances were clearly erroneous in part

because Danielski did not call a "qualified or licensed engineer" to testify about the facility's design. Brief for appellants at 27. Instead, Danielski presented documentation by an agri-services and engineering firm Danielski had engaged to ensure the confined animal feeding use complied with the applicable rules and regulations, and it elicited the related testimony of the firm's founder. According to Amorak, the firm's founder was unqualified to provide expert testimony. Amorak makes no claim that the testimony was inadmissible for purposes of odor assurances but contends, in essence, that the district court gave the testimony undue weight. It is not our role, however, to reweigh the evidence, and Amorak offers no other reason why the testimony rendered the district court's judgment clearly wrong.

Amorak next asserts that Danielski's odor assurances were inadequate under the zoning regulations because there was testimony that the odor assurances Danielski submitted were designed for a confined animal feeding use that would hold fewer animals than Danielski's proposed use. Amorak cites testimony (1) that some of the practices outlined in the assurances were almost identical to those designed for facilities with fewer animals and (2) that the practices were not specifically designed to satisfy the zoning regulations. Even if accurate, neither of these examples support the proposition that Danielski's odor assurances did not satisfy the zoning regulations. Amorak's argument assumes that odor assurances designed for smaller facilities could not also fulfill zoning regulations for larger facilities and that odor mitigation practices that were not designed with the zoning regulations specifically in mind could not satisfy the zoning regulations. This reasoning does not demonstrate that the district court committed clear error in finding otherwise.

Finally, Amorak contends that the district court's factual findings concerning odor assurances were clearly erroneous because the judgment did not address the testimony of Amorak's odor expert. That witness reviewed the assurances

and testified that they were not specific enough or based on objective measurements. As noted above, the zoning regulations do not require specific, objective assurances related to odor. Moreover, Amorak essentially asks us to juxtapose the odor expert's testimony with other testimony that the assurances were sufficient and conclude that the odor assurances were wanting. But it is not our role to reweigh the evidence, and we resolve evidentiary conflicts in favor of the successful party, here Danielski. See *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 959 N.W.2d 251 (2021). Under this standard of review, we cannot conclude that the district court clearly erred in finding the odor assurances adequate under the zoning regulations, even when the odor expert's testimony suggested otherwise.

(c) Compliance With Water
Contamination Regulations

We now turn to Amorak's challenge to the district court's findings that Danielski demonstrated compliance with zoning regulations regarding water contamination.

The district court concluded that Danielski's application satisfied a number of regulations regarding water contamination. The district court found that the engineered plans for manure pits and manure disposal that Danielski submitted with its application, as well as the permit it obtained using a nutrient management plan, satisfied § 501.05(15)(E). Section 501.05(15)(E) requires all methods of manure disposal and related facilities and operational activities, among other things, to be engineered and developed to minimize water pollution. The district court determined that the 18,000 to 20,000 acres leased by Danielski, along with Danielski's intent to follow the nutrient management plan and best practices submitted with the application, satisfied § 501.05(15)(F), which requires an "adequate amount of such land . . . based on the nutrient needs of the crops to be produced" to avoid water contamination from manure application.

Section § 501.05(15)(G) addresses stockpiling or composting manure, bedding, and other waste; the district court found that Danielski had met this subsection's requirements with its plans for concrete floors and manure pits to minimize water pollution. As for § 501.05(15)(J), which pertains to the natural environment characteristics of the confined animal feeding use's location, the district court determined that it was satisfied by testimony that the confined animal feeding use would not be located in an area subject to flooding on a 100-year basis; moreover, the water table would be 170 to 180 feet below the facility, beneath a hardened layer of caprock, and the facility would be equipped with monitoring wells. Given the evidence described above, the district court further found that Danielski had satisfied § 1008.08, which requires that the confined animal feeding use will not result in "undue potentials for . . . water pollution."

Amorak opposes the district court's findings as to the location of the confined animal feeding use, manure management, and the facility's design. None of Amorak's arguments establish reversible error.

### (i) Location of Confined Animal Feeding Use

Amorak contends that the district court committed a legal error in finding that the location requirements for a confined animal feeding use set forth in § 501.05(15)(J) did not apply to the manure application sites planned by Danielski because the manure would be injected into the soil. Amorak cites policies and zoning regulations aimed at preventing water contamination to argue that the location requirements in § 501.05(15)(J) should apply to Danielski's proposed application to cropland. We disagree.

The plain and unambiguous language of the zoning regulations demonstrates that § 501.05(15)(J) does not apply to land where manure is injected into the soil. Section 501.05(15)(J) provides that "[a]ny confined animal feeding use" shall be located only in areas that have certain characteristics, such

as not being subject to flooding on a 100-year basis and having other environment characteristics that will "minimize the potential for surface and ground water contamination." Section 303.23 defines confined animal feeding use as the raising, feeding, or management of more than 300 animal units under certain conditions and "shall include any land where untreated or partially treated manure is applied to the surface of the land, but not where such manure is spread on the surface of the land as a solid or injected into the soil as a liquid." There is no dispute that Danielski planned to inject manure into the soil as a liquid. Therefore, the site of such application is not a confined animal feeding use under the zoning regulations and is not subject to the requirements set forth in § 501.05(15)(J) for "[a]ny confined animal feeding use."

### (ii) Manure Application to Cropland

Amorak argues that the district court clearly erred in relying on the nutrient management plan that Danielski submitted with its application for the conditional use permit. Danielski commissioned the nutrient management plan to obtain a permit from the relevant state agency and to show compliance with state and federal regulations. The plan described methods and procedures Danielski would use to apply manure to cropland in a manner that would preserve natural resources and was among several compilations of information Danielski submitted in applying for the conditional use permit. Other documentation and testimony also addressed the application of manure to cropland.

In its attempt to demonstrate clear error by the district court, Amorak isolates numerous details in the nutrient management plan that it claims were inaccurate or based on flawed assumptions. We understand Amorak to claim that because some aspects of the nutrient management plan were inconsistent with the zoning regulations or other evidence, Danielski's application for a conditional use permit ought to have failed.

But the district court did not rely on the nutrient management plan alone. Danielski presented other evidence to support its application for the conditional use permit. Based on our reading of the evidence as a whole, in conjunction with the zoning regulations, we see no clear error in the district court's findings above that Danielski's showings regarding manure application and the potential for water contamination were sufficient.

Amorak argues that the district court erred in relying on the plan because it inaccurately identified the crop rotation for all manure application sites as "continuous corn," contrary to undisputed historical crop practices on those sites of rotating corn and soybeans. This was significant, Amorak asserts, because there was testimony at trial that different crop rotation practices would affect how much nitrogen from the manure—with corn using more nitrogen than soybeans— would be absorbed by the crops, as opposed to contaminating water sources, and at what rate. "[U]nless the application sites abandon their traditional crop rotation," Amorak submits that they would not require as much manure as was set forth in Danielski's plan. Brief for appellants at 36. Relatedly, Amorak claims error in the district court's reliance on the nutrient management plan due to the distinction between organic and nonorganic corn. Amorak cites testimony that Danielski had planted both types but that the plan did not account for the fact that organic corn absorbs less nitrogen than nonorganic corn. However, Amorak fails to acknowledge testimony that Danielski farms two to three times the acres needed to dispose of the manure and that even if the crop rotation was not "continuous corn," Danielski farmed enough acres of corn to use the manure. We conclude that the district court's findings were consistent with this evidence.

On the topic of the land on which Danielski planned to apply the manure, Amorak finds fault with the district court's determination that Danielski owns and leases 18,000 to 20,000

acres. Amorak admits that there is testimony to support this finding but argues the nutrient management plan did not reflect that this number of acres was available to show sufficient application sites for the manure produced by the confined animal feeding use. We conclude that by acknowledging there was testimony to support the district court's finding as to the number of acres owned and leased, Amorak refutes its own argument. Because there is evidence to support the district court's finding, Amorak has not demonstrated clear error.

Amorak also claims the district court committed error in finding that Danielski's plan provided sufficient safeguards to minimize the risks of overapplication of manure and in observing that "overapplication [of manure] is always a concern, that risk exists with organic as well as commercial or synthetic fertilizers." Amorak characterizes the reference to commercial or synthetic fertilizers as an irrelevant statement, unsupported by the record, that rises to the level of clear error. But we read the district court's judgment as noting that anything can be applied to the soil too liberally and that here, Danielski had provided sufficient assurances that overapplication of manure would not occur. Amorak has not identified clear error in this regard.

Finally, Amorak claims that the district court erred in relying on the nutrient management plan because the lease agreements between Danielski and third-party landowners do not contain any requirement as to how much manure the third-party landowners must accept and when. Amorak asserts that according to testimony at trial, this creates the potential for applying manure to unsuitable sites. But again, there was evidence that Danielski farmed many more acres than were actually required for manure application. And there was testimony that future leases may contain provisions for manure requirements. We do not see how the absence of lease agreements providing for the acceptance of manure application renders the district court's judgment clearly erroneous.

(iii) *Confined Animal Feeding Use; Natural
Environment Characteristics and Design*

Amorak opposes the district court's findings concerning the potential for water contamination in the area of the confined animal feeding use. But these arguments, too, fail to identify clear error.

Amorak submits that the district court erred in relying on a well driller's testimony that hardened caprock he had observed while drilling on the site of the confined animal feeding use would slow the progress of nitrates leaching into the ground water. According to Amorak, the district court erred in not crediting the "unrefuted" testimony to the contrary by its geologist and hydrogeologist expert. Brief for appellants at 42. Again, we refuse Amorak's invitation to reweigh contradictory testimony. As Amorak acknowledges, the district court credited the testimony that the caprock would slow the progression of contaminants toward ground water. This does not amount to clear error.

Amorak also asserts that the district court clearly erred in "crediting the design and engineering" of the confined animal feeding use as evidence of compliance with zoning regulations related to water contamination. *Id*. at 38. As it did concerning odor mitigation, Amorak again urges that Danielski did not call an engineer to testify, but, rather, the founder of the agri-services and engineering firm Danielski engaged to attain compliance with the regulations. Amorak further argues that the district court erred in receiving the documentation presented in conjunction with this testimony, over its hearsay objections. As we explained above, in essence, Amorak asks us to reweigh the evidence, but that is not our role. See *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 959 N.W.2d 251 (2021). And we will not consider Amorak's claims that the district court erred in receiving the documentation presented because Amorak failed to assign admission of evidence as error. *Nebraska Republican Party v. Shively*, 311

Neb. 160, 971 N.W.2d 128 (2022) (appellate court does not consider errors which are argued but not assigned).

## V. CONCLUSION

We find the district court had jurisdiction over Amorak's appeal pursuant to §§ 23-114.01(5) and 25-1937 and *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008). We further conclude that the district court did not err in finding that Danielski demonstrated compliance with the zoning regulations to support the issuance of the conditional use permit. We therefore affirm.

Affirmed.